# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00689-CR

**David Wayne Ford, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 424TH DISTRICT COURT OF BLANCO COUNTY
### NO. CR01691, THE HONORABLE EVAN C. STUBBS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted David Wayne Ford of both forgery and engaging in organized criminal activity and after he pleaded "true" to two enhancement paragraphs, assessed punishment at 20 years' and 50 years' imprisonment, respectively. *See* Tex. Penal Code §§ 32.21(b), (d), 71.02(a)(8), (b). The trial court entered judgments of conviction on the verdicts with the sentences to run concurrently. In nine appellate issues, Ford contends that (1) *Brady* violations and ineffective assistance of counsel entitle him to reversal of his convictions, (2) he was improperly denied both a continuance and standby counsel's help with jury selection, (3) the trial court should have sustained his objection to the State's giving closing punishment argument after he waived his own, (4) comments during the punishment argument were objectionable, (5) the evidence was insufficient to support his convictions, (6) we should "revisit" a decision by the Court of Criminal Appeals about examining trials, (7) we should "revisit" a decision by the Court of Criminal Appeals prohibiting calling witnesses who will assert their Fifth Amendment rights not to answer

questions, (8) he was entitled to a mistrial once one or two jurors saw him in handcuffs on a lunch break, and (9) cumulative error requires reversal. We affirm.

## BACKGROUND

On January 18, 2019, Ford entered the Blanco Security State Bank & Trust and cashed a check for $2,209.11. His name was typed on the check, which was purportedly drawn by J.T. Drilling, Ltd., on its account with a Fredericksburg bank. The Blanco bank branch vice president called the Fredericksburg bank to verify funds. Around this time Vincent Smith-Brule walked in but left about 30 seconds later, when the branch vice president asked Ford questions. After Smith-Brule left, he got into a white car parked across the street. The branch vice president finished her call; counted out the $2,209.11 in cash, including four $50 bills; and handed it to Ford, who took it and walked out. He walked back across the street and got into the same white car.

About eight minutes later and after Ford had left the bank, Smith-Brule got out of the white car that Ford got in and walked back in the bank but to a different teller line than the one Ford had used. He handed over his ID and presented for cashing another check, which had his name typed on it and was also purportedly drawn on J.T. Drilling's account and looked like Ford's.

The branch vice president suspected something and reported this to the branch manager, who called J.T. Drilling. He spoke with its owner, who said that neither check was authorized. Meanwhile, Smith-Brule quickly left the bank, leaving his ID and the check, and got back in the same white car, which had changed parking spots. Video surveillance showed both Ford and Smith-Brule enter the car, and the branch manager phoned a Blanco Police Department (BPD) sergeant, who drove up in time to spot the car and gave chase.

2

He followed for about a minute before the car pulled over near the Old Blanco County Courthouse. Rasheen Smith was driving, Smith-Brule sat in the front seat, and Ford sat in the back driver's-side seat. Not long before the car turned onto the courthouse's street, the sergeant radioed a colleague and said, "They're attempting to hide something." He thought that Ford and Smith-Brule "were making furtive movements inside of the vehicle . . . , which led [him] to believe that they were attempting to hide something or conceal something." This went on for several seconds, with both Ford and Smith-Brule "leaning towards the center console area."

Once the car stopped, other officers, including BPD Detective Ben Ablon, arrived to assist. The sergeant ordered Smith out of the car and handcuffed him. In the process, Smith's legs knocked a bundle of ten checks out of the car and onto the ground. The sergeant picked up the checks and discovered ten other checks with the recipients' names typed on them:

    a. another purportedly from J.T. Drilling to Ford, for $2,490.21;

    b. another purportedly from J.T. Drilling to Smith-Brule, for $2,203.08;

    c. two purportedly from Cribley Enterprises Inc. to Ford, for $1,450.88 and $1,475.04, respectively;

    d. two purportedly from Cribley Enterprises to Smith-Brule, for $1,380.17 and $1,405.78, respectively;

    e. two purportedly from Chaparral Cabinetry Inc. to Ford, for $1,403.84 and $1,475.04, respectively; and

    f. two purportedly from Chaparral Cabinetry to Smith-Brule, for $1,350.21 and $1,369.33, respectively.

Law enforcement later spoke to J.T. Drilling's, Cribley Enterprises', and Chaparral Cabinetry's owners, and they all stated (i) that they did not know or employ Ford, Smith, or Smith-Brule

3

and (ii) that their companies did not authorize the checks. Cribley Enterprises' and Chaparral Cabinetry's owners thought that their checks had been stolen from their mailboxes.

With Smith, Smith-Brule, and Ford detained, officers found $209 in cash on Ford, including two $50 bills. They also found cash on Smith, including two $50 bills. There was no other cash either on Smith-Brule or anywhere else in the car.

Det. Ablon borrowed a bodycam and started recording, advised Ford of his *Miranda* rights, and asked him if he would tell his side of the story or stay silent. Ford first insisted that Smith was putting him to work in the oilfield. He said that Smith had handed him "my check" while they were in a supermarket parking lot across the street from the bank and told him to visit that bank. When asked if the check was a pre-payment or if instead he had been working the job, Ford responded that he had "been working" in the oilfield but could not name the location. Ford said that Smith was paying him for "picking up stuff and hauling like a hotshot driver" but admitted that he did not have a car and was instead riding in Smith's.

Ford admitted to cashing the check but said that he gave all the money to Smith. When Det. Ablon questioned why he would give someone else his money, Ford answered, "Because I haven't gotten paid yet," and added that he had just started the job that day. Det. Ablon expressed disbelief at that story and asked, "He wrote you that big of a check for one day?" Ford answered, "I didn't understand it either." Ford mentioned setting up the job while getting picked up in the parking lot of an Austin gas station by two men he did not know, who asked him if he wanted to make some money. He left in the strangers' car and was taken to San Antonio, where he met Smith and Smith-Brule, who brought him to the Blanco bank. Det. Ablon asked him how much he was supposed to earn for the job, and Ford answered, "He didn't say yet."

4

The State indicted Ford for forgery and engaging in organized criminal activity and alleged in two enhancement paragraphs prior felony convictions for assault on a public servant and possession of a controlled substance. The trial court appointed an attorney to represent Ford. At the arraignment, Ford, even after admonishments from the court about the risks, demanded to represent himself. At every hearing afterward and all the way through guilt–innocence and punishment, the trial court confirmed that Ford was representing himself, with the formerly appointed attorney present as standby counsel, and Ford proceeded accordingly without objection.

During guilt–innocence, the State established the above facts through witnesses and exhibits. When cross-examining certain witnesses, Ford tried to elicit testimony that someone else concocted the check-cashing scheme, for example, the two men who accosted him at the Austin gas station. In this vein, he elicited from the branch manager that it was possible that Ford could have been just as "fooled" as bank employees were by the forged check that he cashed, meaning that he could have thought that it was payment for legitimate labor.

Similarly with Det. Ablon, Ford advanced a theory involving surveillance videos from the Austin gas station and places where Smith, Smith-Brule, and Ford had stopped before he entered the bank. He suggested that because any such videos would have shown him approached by two other men or talking to others, it would exonerate him. His theory, presumably, was that others stole, altered, and marked the checks, which, he thought, would show that he was not guilty of forgery. And he suggested that because others recruited him into the scheme, he did not himself engage in organized criminal activity. Thus, when cross-examining Det. Ablon, Ford asked if it was possible that surveillance videos from the other locations—a Walmart and a combined Chicken Express and Stripes gas station—would show that another person gave Smith the bundle of checks and the one that Ford cashed. Det. Ablon agreed that it was possible. And about the

5

Austin gas station, Det. Ablon agreed that it was possible for surveillance video to have shown the two men who approached Ford and their setting off with him for San Antonio. But Det. Ablon also repeatedly pointed out to Ford that he never told the detective about any Walmart, Chicken Express, or Stripes, so that law enforcement never knew where Ford wanted them to investigate.

Ford put on a case-in-chief. He called an investigator who the court had appointed to work on Ford's behalf. The investigator explained that by the time he spoke with Ford, any relevant video footage from the Stripes in Blanco had been overwritten because the store's DVR overwrites older video when full. The investigator also discovered that Smith owned a townhome in Maryland, presumably advancing Ford's theory that because Smith had money for an expensive home, Smith was the mastermind while Ford was no more than an unwitting participant.

After closing the evidence, the prosecutor and Ford argued to the jury. Ford argued: "I don't see how in the world on God's green earth that [cash] got put in my wallet. . . . There was no fingerprints extracted from . . . the money to see who might have . . . put that money in my wallet. I was completely broke." He then argued the theory that he could not be guilty of engaging in organized criminal activity because others concocted the scheme or put him up to it:

> The charge did take place in Austin, Texas at the very beginning. The State has tried to start this case right there at the [supermarket] in Blanco where the bank is at, but that's not where it started. Like I said in my opening statement to you guys, it started in Austin, Texas at a Shell station when two guys picked me up and took me to Rasheen Smith at a Walmart.
>
>  . . . .
>
>  . . . They cannot prove that I collaborated with anybody. They cannot prove that I knowingly and intentionally went into a bank. The banker even said anybody could have been fooled. They was even fooled with those checks. So when the—if I was a victim of a scam and I was given a check thinking it was a per diem check to go into a bank and try to cash it, I wouldn't have knowingly and intentionally have done that if I had known it was wrong, but the State tried to make me into a bad guy that I'm not. And the evidence and the videos and the testimony that you guys

6

> have heard proves that the jury has a burden of proof in all criminal cases and that they cannot prove beyond a reasonable doubt that I knowingly and intentionally went into that bank and cashed that check knowing it to be fraud.

The jury convicted him of both forgery and engaging in organized criminal activity. After he pleaded "true" to the enhancement paragraphs, the jury assessed 20 years' imprisonment for forgery and 50 years' imprisonment for engaging in organized criminal activity. He now appeals.

## DISCUSSION

### I.     The evidence was sufficient to show (a) Ford's knowledge that the check he cashed was forged and (b) that there was a combination.

We take up Ford's fifth issue first because it would afford him the most relief if meritorious. In that issue, he contends that the evidence was insufficient to support the convictions for forgery and engaging in organized criminal activity.

A person commits forgery when the person "forges a writing with intent to defraud or harm another." Tex. Penal Code § 32.21(b). The writing at issue was, or purported to be, a check. *See id.* § 32.21(a)(2)(A), (d). The definition of to "forge" that the State alleged was to possess, with intent to issue, transfer, pass, or publish, a writing that was either altered, made, completed, executed, or authenticated so that it purported to be the act of either J.T. Drilling, Ltd., or its owner, who did not authorize the act. *See id.* § 32.21(a)(1)(A)(i), (B), (C). The State also alleged that Ford knew the check was forged, and it is that element that he contends was not supported by sufficient evidence. *See Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015) (State must prove that defendant knew instrument at issue was forged); *Okonkwo v. State*, 398 S.W.3d 689, 695 (Tex. Crim. App. 2013) (same). Proof that the defendant knew the instrument at issue was forged suffices to prove the intent to defraud or harm another required by

7

the statute. *See Johnson v. State*, 425 S.W.3d 516, 520 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd); *Palmer v. State*, 735 S.W.2d 696, 699 (Tex. App.—Fort Worth 1987, no pet.).

As for engaging in organized criminal activity, a person commits that offense if the person, with intent to establish, maintain, or participate in a combination or in the profits of a combination, commits any forgery that is a felony. *See* Tex. Penal Code § 71.02(a)(8). As relevant here, "combination" means three or more persons who collaborate in carrying on criminal activities, although the participants may not know each other's identity and although membership in the combination may change from time to time. *See id.* § 71.01(a)(1), (2). Ford challenges the sufficiency of the evidence to prove a combination. He argues that no evidence showed that he and Smith-Brule ever communicated or that he knew about any other checks in Smith-Brule's or Smith's possession, much less that any such checks were forged.

When reviewing the sufficiency of the evidence, "evidence is considered sufficient to support a conviction when, after considering all of the evidence in the light most favorable to the prosecution, a reviewing court concludes that any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Hernandez v. State*, 556 S.W.3d 308, 315 (Tex. Crim. App. 2017). We are to consider "the combined and cumulative force of all admitted evidence" and remember that "[d]irect evidence and circumstantial evidence are equally probative" and that "circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Ramsey*, 473 S.W.3d at 808–09, 811.

The jury is the exclusive judge of the evidence's credibility and weight, which allows the jury to draw any reasonable inference from the evidence, and resolve any conflicts in it, so long as the inferences or resolutions find support in the record. *See id.* at 809–10. The jury

8

may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs. *See Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

We begin with Ford's knowledge that the check he cashed was forged. That knowledge may be proven by circumstantial evidence, including the defendant's conduct. *See Parks v. State*, 746 S.W.2d 738, 740 (Tex. Crim. App. 1987); *Young v. State*, 591 S.W.3d 579, 588 (Tex. App.—Austin 2019, pet. ref'd); *Leroy v. State*, 512 S.W.3d 540, 543 (Tex. App.—Houston [1st Dist.] 2016, no pet.). But it cannot be inferred merely from possession, presentment, or passing of the forged instrument. *See Parks*, 746 S.W.2d at 740; *Leroy*, 512 S.W.3d at 543.

For several reasons, "the combined and cumulative force of all admitted evidence" reasonably supported the necessary finding. *See Ramsey*, 473 S.W.3d at 808. First, Ford's acts and words suggested his consciousness of his guilt. *See Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) (consciousness of guilt "is perhaps one of the strongest kinds of evidence of guilt" and is "a circumstance tending to prove that [defendant] committed the act with which he is charged"). The BPD sergeant testified that he saw Ford and Smith-Brule trying to conceal something near the car's center console during the chase. Trying to suppress evidence shows consciousness of guilt. *See id.* at 598–99. The jury could have reasonably believed that Ford's changing statements to Det. Ablon included lies intended to conceal his guilt. *See Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1999, pet. ref'd) (defendant's lying about facts underlying offense shows consciousness of guilt). Ford told Det. Ablon that he met Smith and Smith-Brule that day and that they were paying him over $2,200 upon first meeting him and on someone else's behalf to help them pick up and haul items from oilfields. The jury was within its rights to disbelieve these self-serving statements and instead believe J.T. Drilling's

9

owner that Ford never did any work for him. *See Bustamante v. State*, 106 S.W.3d 738, 741 (Tex. Crim. App. 2003) (jury may disbelieve "self-serving" statements).

Second, the check was for a large amount of money, but J.T. Drilling's owner did not know and had never employed Ford. The owner described his company as a family business that has no payroll because only his family members work for the company. This evidence "ma[de] it suspicious that appellant would be given such a large check by a stranger," suggesting that Ford knew it was forged. *See Huntley v. State*, 4 S.W.3d 813, 815 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (en banc); *accord Palmer*, 735 S.W.2d at 698.

Third, Ford had a motive to cash the forged check. *See Nisbett v. State*, 552 S.W.3d 244, 265 (Tex. Crim. App. 2018) ("While motive is not by itself enough to establish guilt of a crime, it is a significant circumstance indicating guilt."); *Russo v. State*, 228 S.W.3d 779, 794 (Tex. App.—Austin 2007, pet. ref'd) (evidence of motive helps prove guilt). Not only did he tell Det. Ablon that he was hundreds of dollars behind on his rent, but he gave that as justification for agreeing to ride with two unknown men from Austin to San Antonio and then with Smith and Smith-Brule, whom he met only that day, from San Antonio to Blanco and then entering the bank that Smith told him to enter with the check that Smith gave him.

Fourth, the other unauthorized checks in the car constitute evidence of extraneous forgeries, which makes it more likely that Ford committed forgery with the check that he cashed. *See Parks*, 746 S.W.2d at 740 (evidence of extraneous forgeries helps prove forgery intent). His story to Det. Ablon about oilfield work is made that much more unbelievable by the presence of the other unauthorized checks, some of which were made out to Ford, including two for four-figure amounts from a cabinetry company. The checks fell out of the car that Ford had ridden in from San Antonio to Blanco and in which he was trying to conceal something alongside Smith-Brule.

10

With these four reasons shown by the evidence, we conclude from the totality of the evidence that the jury reasonably could have found that Ford knew that the check he cashed was forged. This resolves Ford's appellate arguments about the forgery conviction, so we turn to his arguments about evidence of a "combination" as part of organized criminal activity.

Under this element, the evidence needed to show that three or more persons collaborated in carrying on criminal activities, although the participants may not know each other's identity and although membership in the combination may change from time to time. *See* Tex. Penal Code § 71.01(a)(1), (2). We have already concluded that the evidence sufficed to show Ford's knowledge that the check he cashed was forged, and he does not otherwise challenge the sufficiency of the evidence to show forgery. We thus have a jury finding that Ford was involved in criminal activities. The evidence also showed that Smith and Smith-Brule collaborated in those criminal activities because they drove Ford from San Antonio to Blanco, Smith gave him the forged check and told him which bank to use, Smith-Brule tried to cash a forged check in the same bank shortly after but left apparently after hearing the branch vice president question Ford, and Smith-Brule and Ford both tried to conceal something during the police chase. *See Ford v. State*, 282 S.W.3d 256, 263 (Tex. App.—Austin 2009, no pet.) (acts sufficient to prove combination need not themselves be criminal acts). All this suffices to support the jury's finding of a combination. Our conclusion does not depend on any evidence that Smith-Brule and Ford talked to each other (although the jury would have been reasonable to so conclude—they rode from San Antonio to Blanco together and simultaneously tried to conceal something) or on Ford's knowledge of the rest of the checks in the car. We therefore reject Ford's arguments and overrule his fifth issue.

11

**II.** ***Brady* obligations did not attach to videos that the prosecution never possessed, and Ford has not shown that the videos could reasonably have changed his case's outcome.**

Ford's first issue comprises two distinct sub-issues. In the first, he contends that he is entitled to reversal of his convictions because law enforcement did not "seek out" and "acquire" several "store videotapes" even though he alerted the State to the tapes' potential existence and potential exculpatory effect. A month before he was indicted, he says, he made the State aware of surveillance videos likely recorded at the Austin gas station, Walmart, and combined Chicken Express and Stripes. He adds that he later learned that any such videos depicting him probably no longer existed because they were recorded over. Because the potentially exculpatory videos no longer exist and, Ford says, the State had a duty to collect the videos, he argues that he is entitled to a reversal of his convictions.

In the second sub-issue, he contends that he received ineffective assistance from appointed trial counsel because counsel did not secure the videos or an investigator's help to secure them. In January 2019, the trial court appointed the attorney to represent Ford, but he "mo[ved] to waive counsel and represent [him]self" in a motion that he signed on March 13 and that was filed about a week later. At the April 5 arraignment, the court granted his request to represent himself, kept appointed counsel as merely "standby" counsel, and confirmed that counsel no longer represented Ford. Ford's second sub-issue complains about counsel's pre-arraignment assistance.

### A. **Brady** *and the surveillance videos*

The prosecution violates Fourteenth Amendment due process when it suppresses evidence favorable to the defendant that is material either to guilt–innocence or to punishment, regardless of the prosecution's good faith or bad faith. *See Kyles v. Whitley*, 514 U.S. 419, 432–34 (1995); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Harm v. State*, 183 S.W.3d 403, 406 (Tex.

12

Crim. App. 2006).  To show a *Brady* violation, a defendant must show all three of the following: (1) the State suppressed evidence, (2) the suppressed evidence is favorable to the defendant, and (3) the suppressed evidence is material.  *Harm*, 183 S.W.3d at 406.  Under *Brady*, "prosecutors have a duty to learn of *Brady* evidence known to others acting on the state's behalf in a particular case."  *Id.* (citing *Kyles*, 514 U.S. at 437–38).  But this duty arises only for evidence that is "unknown to the defense."  *See Kyles*, 514 U.S. at 437.  So if the defendant knows about the *Brady* material and its content, the State cannot be said to have "suppressed" it.  *See Pena v. State*, 353 S.W.3d 797, 810–11 (Tex. Crim. App. 2011); *Havard v. State*, 800 S.W.2d 195, 204–05 (Tex. Crim. App. 1989) (defendant failed to make out *Brady* claim for statement that he had given to sheriff because defendant "knew of both the existence and the content of his statement, as a matter of simple logic"), *withdrawn in part on other grounds on reh'g*, 800 S.W.2d at 206 n.\*, 213–18.

The prosecution "suppresses" evidence only if certain predicate conditions exist. One such condition is that it or its agents possess the evidence.  *Harm*, 183 S.W.3d at 406–07. Because of this condition, the State "is not required to seek out exculpatory evidence independently on appellant's behalf, or furnish appellant with exculpatory or mitigating evidence that is fully accessible to appellant from other sources."  *Id.* at 407.  Thus, even when Child Protective Services once had records that a defendant could have used to impeach a prosecution witness, the defendant did not establish her *Brady* claim in part because she had "the CPS records before the state did" and CPS was not "working with the prosecution or at its behest."  *Id.* at 405–08.

Ford does not suggest that the prosecution or its agents possessed any surveillance video from the Austin gas station, Walmart, or combined Chicken Express and Stripes or that the stores were ever working with the prosecution or at its behest.  Indeed, he presents his first issue based on a supposed "affirmative duty to seek out video evidence."  He relies on *Kyles*, but the

13

duties addressed there attach only to evidence "unknown to the defense." *See* 514 U.S. at 437.

Ford, however, knew about the videos before trial. *See Pena*, 353 S.W.3d at 810–11; *Havard*,

800 S.W.2d at 204–05. He also relies on cases in which the prosecution possessed *Brady* material.

*See Arizona v. Youngblood*, 488 U.S. 51, 52–53 (1988) (samples taken at hospital for police

sexual-assault kit and later analyzed by police criminologist); *United States v. Bagley*, 473 U.S. 667,

671 (1985) (written agreements between government and prosecution witnesses); *California v.*

*Trombetta*, 467 U.S. 479, 481–82 (1984) (breathalyzer samples taken by officers). But here,

nothing in the record suggests that the prosecution or its agents ever acquired the videos. Ford

has not pointed to any authority that required the prosecution to have acquired the videos;

instead, *Brady* disclosure requirements attach only once the prosecution or its agents possess the

material.[1] *See Harm*, 183 S.W.3d at 406–07 (prosecution need not "seek out exculpatory evidence

independently on appellant's behalf"). Ford thus has not shown a *Brady* violation.

## B. Ineffective assistance and the surveillance videos

To succeed on an ineffective-assistance claim, the appellant must show both that

(1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense.

*Garza v. State*, 213 S.W.3d 338, 347 & n.18 (Tex. Crim. App. 2007) (citing *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984)). To show deficient performance, the appellant must prove

by a preponderance of the evidence that counsel's representation fell below the standard of

professional norms. *Id.* at 347–48 & n.19 (citing *Strickland*, 466 U.S. at 688). To show prejudice,

the appellant must show a reasonable probability that but for counsel's unprofessional errors, the

---

[1] The American Bar Association Criminal Justice Standards that Ford quotes at length in his reply brief recognize this limitation. The Standards that he quotes apply to "all information in the possession of the prosecution or its agents."

14

result of the proceeding would have been different. *Garza*, 213 S.W.3d at 348 & n.20 (citing *Strickland*, 466 U.S. at 694). To show prejudice from a purported failure to investigate the facts of a case, the appellant must show that the results of the investigation not undertaken "reasonably could have changed the result of th[e] case." *See Cooks v. State*, 240 S.W.3d 906, 912 (Tex. Crim. App. 2007); *accord Stokes v. State*, 298 S.W.3d 428, 432–33 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). Absent either showing—deficient performance or prejudice—a reviewing court must deny relief because it cannot conclude that the conviction resulted from a breakdown in the adversarial process that made the result unreliable. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *Ex parte Menchaca*, 854 S.W.2d 128, 131 (Tex. Crim. App. 1993). The standards for ineffective assistance during the guilt–innocence and punishment phases are generally the same. *West v. State*, 474 S.W.3d 785, 794 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Hernandez v. State*, 988 S.W.2d 770, 771 (Tex. Crim. App. 1999)).

Appellate review of trial counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance. *Garza*, 213 S.W.3d at 348. Counsel's performance is evaluated not in hindsight but from counsel's perspective at the time. *See Strickland*, 466 U.S. at 689; *Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim. App. 1993). If the reasons for counsel's conduct do not appear in the record and if there is at least the possibility that the conduct could have been grounded in legitimate trial strategy, the reviewing court defers to counsel's decisions and denies relief on an ineffective-assistance claim on direct appeal. *Garza*, 213 S.W.3d at 348. Counsel usually should be allowed to explain their actions; without such an opportunity, the reviewing court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App.

2005).  Absent an evidentiary hearing, the ineffective-assistance burden is difficult to meet on direct appeal: "Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation."  *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *Blevins v. State*, 18 S.W.3d 266, 271–72 (Tex. App.—Austin 2000, no pet.).

Here, we assume that the videos would have shown everything that Ford suggests— that two unknown men recruited him to leave the Austin gas station with them, that either of those men or Smith or Smith-Brule organized the scheme to cash forged checks, and that Smith or Smith-Brule and not Ford received the checks.  We also assume that Ford did not make any markings or alterations on the check that he cashed, save for indorsing the back.  Even so, Ford has not shown facts from which we could conclude that the surveillance videos reasonably could have changed the result of the case in guilt–innocence.  *See Cooks*, 240 S.W.3d at 912; *Stokes*, 298 S.W.3d at 432–33.  Even if he did not concoct the forgery scheme or mark or alter the check himself, he was still guilty of forgery because he gave the check to the teller to cash it, the check was not authorized by the purported drawer, and he knew it was forged.  Those actions constitute forgery under the statute.  *See* Tex. Penal Code § 32.21(a)(1)(B), (C), (2)(A), (b), (d); *Johnson*, 425 S.W.3d at 520; *Palmer*, 735 S.W.2d at 699.  And even if someone else concocted the entire scheme, Ford still collaborated in it, which supports his part in a combination engaging in organized criminal activity.  He took the forged check from Smith; cashed it at the bank that Smith told him to; tried to conceal something alongside Smith-Brule during the chase; and rode with both men with other forged checks, including several made out to Ford in large amounts and at least some of which were from a cabinetry company, which was inconsistent with the oilfield-work

16

story that he told Det. Ablon. *See* Tex. Penal Code §§ 71.01(a), 71.02(a)(8). He thus has not shown that the jury would have found him not guilty instead of guilty for either offense.

As for punishment, Ford pleaded "true" to the two enhancement paragraphs, which alleged that he had previously committed felony assault on a public servant and felony possession of methamphetamine, both in Texas. The State presented testimony from an investigator, who testified about the two prior Texas convictions and about another from Virginia. In Virginia, Ford was sentenced to 15 years' confinement, probated, for abduction. While on parole from his Texas sentence for possession of methamphetamine, Ford committed the charged forgery and engaging in organized criminal activity. The State then rested its punishment case, and Ford declined to put on any evidence of his own or offer any closing argument. In this context, Ford has not shown that the surveillance videos would have changed the outcome of his sentences. *See Cooks*, 240 S.W.3d at 912; *Stokes*, 298 S.W.3d at 432–33. We thus overrule his first issue.

### III. Ford's contention about denied help with jury selection is without merit, and the one about a denied continuance was not preserved for review.

In his second issue, Ford contends that his "constitutional right to effectiveness of counsel was denied" because the trial court refused to let standby counsel "assist [Ford] with the questions" during jury selection and because it had earlier denied a continuance. Ford's arguments on appeal are equivocal: at times he says that the trial court denied him a right to hybrid representation, and at others he says that his request when voir dire began constituted a waiver of his right to represent himself and thus a request for appointed counsel to take over the defense.

The history of Ford's demands to represent himself here is instructive. Though appointed an attorney, he sought to "waive counsel and represent [him]self," offering as a reason disagreements with appointed counsel about procedural strategy. At the arraignment, the trial

17

court admonished Ford that although he enjoyed the right to represent himself, doing so is "almost always a terrible idea" and he likely lacked necessary legal training, to which Ford responded that he had decades of experience as a paralegal. After the admonishments and at Ford's request, the court granted his motion to represent himself and kept the appointed attorney on as "standby" counsel only. Then at every hearing between the arraignment and voir dire, the trial court confirmed that Ford wanted to represent himself without counsel's assistance and that the appointed attorney was present only as "standby" counsel, often telling Ford that the appointed attorney "does not represent" him. Ford proceeded with this understanding in place.

Just before voir dire, Ford signed a "Waiver of Right to Representation by Counsel," which says that he knew about his right to appointed counsel and that he "waive[d] that right and request[ed] the Court to proceed with my case without an attorney being appointed." Later that morning, after the court sat and instructed the venire panel before the prosecutor's voir dire, the court asked the prosecutor and Ford to approach, and Ford said: "I'm not really prepared for the voir dire. Can [appointed counsel] assist me with the questions?" The court refused.

If this request was for hybrid representation—for example, appointed counsel would conduct some of the voir dire and then Ford the trial defense—Ford had no right for it to be granted. There is no constitutional right to hybrid representation. *See McKaskle v. Wiggins*, 465 U.S. 168, 182–83 (1984); *Scarbrough v. State*, 777 S.W.2d 83, 92 (Tex. Crim. App. 1989); *Figueroa v. State*, 250 S.W.3d 490, 514 & n.115 (Tex. App.—Austin 2008, pet. ref'd). A trial court may permit hybrid representation in its discretion. *Scarbrough*, 777 S.W.2d at 92; *Figueroa*, 250 S.W.3d at 515. A trial court abuses that discretion only when its decision lies outside the "zone of reasonable disagreement." *Figueroa*, 250 S.W.3d at 515; *Ganther v. State*, 187 S.W.3d 641, 648 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd).

18

During its pre-voir dire instructions to the venire panel, the trial court explained that Ford represented himself and that appointed counsel could only explain to Ford procedure and evidentiary predicates while Ford would make all the decisions for his defense, leaving appointed counsel "simply there in an advisory capacity." Given these instructions, we cannot conclude that the trial court abused its discretion by refusing a request for hybrid representation. *Ganther*, 187 S.W.3d at 648–49 ("[A]fter explaining hybrid representation was not allowed, the trial court did not act outside the zone of reasonable disagreement by remaining consistent with the procedure it had explained to the venire panel."); *see also Figueroa*, 250 S.W.3d at 515 (hybrid representation "has great potential for chaos" (quoting *Ganther*, 187 S.W.3d at 648)).

If instead Ford's request was to withdraw his waiver of his right to counsel, so that appointed counsel would take over the defense, such a withdrawal "may be found if it reasonably appears to the court that defendant has abandoned his initial request to represent himself." *Funderburg v. State*, 717 S.W.2d 637, 642 (Tex. Crim. App. 1986). But the withdrawal may be denied when granting it would obstruct orderly procedure or interfere with the fair administration of justice. *See Calamaco v. State*, 462 S.W.3d 587, 592 (Tex. App.—Eastland 2015, pet. ref'd); *Medley v. State*, 47 S.W.3d 17, 23 (Tex. App.—Amarillo 2000, pet. ref'd); *see also United States v. Taylor*, 933 F.2d 307, 311 (5th Cir. 1991) ("A defendant is not entitled to choreograph special appearances by counsel, or repeatedly to alternate his position on counsel in order to delay his trial or otherwise obstruct the orderly administration of justice." (internal citation and quotation omitted) (quoting *McKaskle*, 465 U.S. at 183)); *Culverhouse v. State*, 755 S.W.2d 856, 861 (Tex. Crim. App. 1988) ("A request for change of counsel cannot be made . . . so as to obstruct orderly procedure in the courts or to interfere with the fair administration of justice. A defendant may not use his right to counsel to manipulate the court or to delay his trial." (internal citation omitted)).

We therefore review the trial court's denial of Ford's attempted withdrawal as a decision about the "control of the business of the [trial] court," which is reviewed for an abuse of discretion. *Medley*, 47 S.W.3d at 23–24 (quoting and citing *Marquez v. State*, 921 S.W.2d 217, 223 (Tex. Crim. App. 1996)). To prevail, Ford must show facts entitling him to relief. *Id.* at 24 (citing *Marquez*, 921 S.W.2d at 223). If the trial court had before it a conflicting record about whether to grant or deny the withdrawal, then it did not abuse its discretion by denying the withdrawal. *See id.* (citing *Marquez*, 921 S.W.2d at 223). Ford must show that granting the withdrawal would not have (1) interfered with the orderly administration of the business of the court, (2) resulted in unnecessary delay or inconvenience to witnesses, or (3) prejudiced the State. *See Calamaco*, 462 S.W.3d at 592–93; *Medley*, 47 S.W.3d at 24.

Here, the trial court did not abuse its discretion by denying Ford's attempted withdrawal of his waiver of his right to counsel because the court had before it a mixed record about whether Ford was abandoning his right to represent himself, *see Funderburg*, 717 S.W.2d at 642, and under the three *Medley* requirements. Ford's request was only that standby counsel "assist me with the questions" during voir dire—not that he take over the entire defense. Given Ford's earlier repeated acquiescence after the court began every hearing, and even the trial itself, by confirming that Ford was voluntarily representing himself, the trial court could have reasonably concluded from the record that Ford's voir dire request was not an abandonment of self-representation. *See Funderburg*, 717 S.W.2d at 642. Similarly, Ford has not shown that his attempted withdrawal would not have (1) interfered with the orderly administration of the business of the court or (2) resulted in unnecessary delay. *See Medley*, 47 S.W.3d at 24. He made his request in the moments between the court's pre-voir dire instructions to the already-seated venire panel and the start of the prosecutor's voir dire. Before that point, the record shows that standby

20

counsel had been operating for over four and a half months under instructions from the trial court that standby counsel was "not going to proactively do anything" and could do no more than "assist" Ford. These features of the record allowed the trial court reasonably to conclude that Ford failed to meet the first two of *Medley*'s requirements. Thus, under both *Funderburg* and *Medley*, we conclude that the trial court did not abuse its discretion by denying Ford's attempted withdrawal of his waiver of his right to counsel (if that was his intention).

As for the continuance, 17 days before trial, Ford, the prosecutor, and the trial court were discussing subpoenas for Smith and Smith-Brule. During that discussion, Ford said,

> I'm going to need more time, Your Honor, because I'm in the process of getting with an attorney as a pro bono in this case because I am not allowed to get access to a law library or anything like that to be able to represent myself adequately, so I'm asking for a continuance in that case.

The court denied the continuance. Because Ford's request for a continuance was oral and unsworn, he has not preserved this issue for appellate review. *Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012); *see* Tex. Code Crim. Proc. arts. 29.03, 29.08.

To sum up, we reject or cannot review Ford's arguments about the trial court's actions that he thinks infringed his constitutional right to counsel.[2] We overrule his second issue.

---

[2] His appellate briefs also make nonspecific references to "*Faretta* violations." If he is complaining about actions by the trial court that we have not addressed, his reliance on *Faretta* is misplaced. There, the Court reviewed a procedure that forced on an unwilling defendant appointed counsel. *See Faretta v. California*, 422 U.S. 806, 807, 819, 832, 835–36 (1975). No such forcing exists here: when Ford rejected assistance of counsel, the trial court let him represent himself.

21

**IV.** **The trial court did not abuse its discretion by allowing the prosecutor further punishment argument after Ford refused to give any argument.**

In his third issue, Ford challenges the order of argument that the trial court used at the end of the punishment phase. The prosecutor gave a closing argument and reserved time for rebuttal, but Ford refused to give any closing argument, so he contends that the court should not have allowed the prosecutor to argue any further.

"The order of argument may be regulated by the presiding judge; but the State's counsel shall have the right to make the concluding address to the jury." Tex. Code Crim. Proc. art. 36.07. This statute "gives broad discretion to the trial court regarding the general order of arguments with the caveat that the State" gets the last argument. *Dang v. State*, 154 S.W.3d 616, 619–20 (Tex. Crim. App. 2005). We thus review a trial court's decision about the order and format of closing arguments for an abuse of discretion. *See id.*; *Threadgill v. State*, 146 S.W.3d 654, 673 (Tex. Crim. App. 2004). Specifically, "[t]he question of whether, when the defendant's counsel declines to address the jury, the court shall permit more than one argument to be made by state's counsel, is one of discretion in the trial court." *James v. State*, 563 S.W.2d 599, 603 (Tex. Crim. App. [Panel Op.] 1978) (quoting *Walker v. State*, 141 S.W. 243, 244 (Tex. Crim. App. 1911)).

*James* involved an issue similar to Ford's. The prosecutor there ended punishment argument without "ask[ing] for a specific sentence," and when the "appellant declined argument and objected to any further argument by the prosecutor," the trial court sustained the objection. *Id.* Outside the jury's presence, the prosecutor asked to reopen closing argument, and the trial court again sustained the defendant's objection. *Id.* But then within the jury's hearing, the prosecutor asked to reopen closing argument "so that [the State] might ask the jury for a life sentence." *Id.* The defendant objected again, but the trial court overruled this objection and refused to grant a

22

mistrial or instruct the jury about the life-sentence request made within their hearing. *Id.* The Court of Criminal Appeals, though disapproving "of the prosecutor's improper disregard of" the sustained objection, concluded that the trial court "would not have abused its discretion if he had permitted the prosecutor to argue to the jury after the appellant declined to argue." *Id.*

That reasoning controls this case. Before arguing, the prosecutor asked to split her time, and the trial court said it would let her. She discussed the charge and punishment ranges and ended with: "I'm going to save the rest of my time to come back and speak with y'all in a second." She, like the *James* prosecutor, had not yet asked for a sentence. When the trial court let her argue again, over Ford's objection, she asked the jury to "[s]end a message"—"a very strong" one—with a sentence that would speak "to people that are thinking about coming here and preying on your banks and your small[-]business owners." We conclude that the trial court did not abuse its discretion by "permit[ing] the prosecutor to argue to the jury after the appellant declined to" and without yet asking for a specific sentence. *See id.*; *accord Martin v. State*, 623 S.W.2d 391, 396–97 (Tex. Crim. App. [Panel Op.] 1981). We overrule this issue.

## V. Ford forfeited appellate review of the comments from punishment argument that he argues were objectionable.

In his fourth issue, Ford contends that portions of the punishment argument were "improper and inflammatory," denying him Fourteenth Amendment due process. As the State points out, and Ford acknowledges, he did not object to any of the comments that he now says were objectionable. A defendant forfeits the right to complain on appeal about jury argument— even argument so prejudicial that an instruction to disregard could not have cured it—when the defendant fails to object. *Mathis v. State*, 67 S.W.3d 918, 926–27 (Tex. Crim. App. 2002); *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (citing *Marin v. State*, 851 S.W.2d 275,

279 (Tex. Crim. App. 1993)); *accord* Tex. R. App. P. 33.1(a). "[E]ven constitutional errors," like denial of due process, "may be waived by failure to object at trial." *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995). Because Ford did not object, he forfeited this issue.

## VI. Ford's disagreement with *Salinas* is unavailing because it is still binding authority.

In his sixth issue, Ford "requests this Court to revisit [*State ex. rel Holmes v. Salinas*, 784 S.W.2d 421 (Tex. Crim. App. 1990),] which effectively eliminates the right to an examining trial afforded by Article 16.01, Texas Code of Criminal Procedure." In *Salinas*, the Court of Criminal Appeals explained the interplay of Article 16.01 examining trials and indictments returned by a grand jury. *Id.* at 424–25. A grand-jury indictment extinguishes the need for any examining trial because examining trials put the State to its burden to prove probable cause to accuse a defendant of an offense. *Id.* Because an indictment returned by a grand jury supplies the same determination that probable cause exists that an examining trial would, "the reason or justification for the [examining trial] ceases at the time the grand jury returns its own probable cause determination via the indictment," "even in the case where the [examining trial] is pending or is due to resume at a later date." *Id.* at 425. The Court of Criminal Appeals has not overruled *Salinas* and has cited it with approval most recently in 2003. *See Galloway v. State*, No. 73766, 2003 WL 1712559, at *4 (Tex. Crim. App. Jan. 29, 2003) (op., not designated for publication). We are thus bound by it and overrule Ford's sixth issue.

## VII. Ford's disagreement with *Ellis* is unavailing because it is still binding authority.

In his seventh issue, Ford asks us to "revisit" *Ellis v. State*, 683 S.W.2d 379 (Tex. Crim. App. 1984), which he contends prevented him from calling Smith and Smith-Brule as witnesses over their insistence that they would assert their Fifth Amendment rights to refuse to

24

answer every question that they might be asked. As the State notes, "[w]hatever the merits or demerits of *Ellis*, [Ford] alleges no error by the trial court or harm resulting from any erroneous ruling." Because Smith and Smith-Brule, on voir dire outside the jury's presence, said that they would refuse to answer every question and instead assert their Fifth Amendment rights, *Ellis* forbade the trial court from letting Ford call them before the jury. *See id.* at 382–83. The Court of Criminal Appeals has not overruled *Ellis*, citing it with approval as recently as 2003. *See Son Vu Khai Tran v. State*, No. 74040, 2003 WL 1799013, at *5 n.5 (Tex. Crim. App. Apr. 2, 2003) (op., not designated for publication). We are thus bound by it also and overrule Ford's seventh issue.

## VIII. Ford has not carried his burden to show that one or two jurors' seeing him in handcuffs merited a mistrial.

In his eighth issue, Ford contends that he is entitled to a new trial because one or two jurors saw him in handcuffs on a lunch break. The facts underlying this issue show an inadvertent, momentary exposure to jurors instead of a continuous one. *Compare Clark v. State*, 717 S.W.2d 910, 918–19 (Tex. Crim. App. 1986) (overruling appellate issue about "inadvertent and fortuitous" exposure of handcuffed defendant), *with Wiseman v. State*, 223 S.W.3d 45, 47, 52 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (reversing and remanding for new trial when defendant was "shackled for the duration of his trial"). After Ford and the bailiff brought the exposure to the trial court's attention and explained what happened, the court summarized: "[Ford] was escorted to the car to go to eat lunch because there's no—there's no food facilities in this courthouse and that, according to Mr. Ford, he believes possibly two jurors observed him in handcuffs being escorted to the car." The court then asked the bailiff if the exposure was intentional, and the bailiff said it "was completely unintentional." Ford declined to question the bailiff, put on any other evidence about the issue, or respond to the trial court's summary.

25

When a similar exposure arose in *Clark*, the Court of Criminal Appeals concluded that the appellant had not carried his burden to show evidence that the inadvertent exposure influenced or affected any juror. 717 S.W.2d at 919. So too here because Ford says only that "[a]rguably this could have prejudice[d]" him with any juror and does not offer proof that any juror discussed him in handcuffs or that the exposure influenced or affected any juror. Although "all efforts should be maintained to see that" no juror sees the defendant in handcuffs, a mistrial was not required. *See id.* at 918–19. We overrule Ford's eighth issue.

## IX. There is no "cumulative error" warranting a new trial.

In his ninth issue, Ford requests "cumulative error" review and reversal and remand as a result. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("It is conceivable that a number of errors may be found harmful in their cumulative effect."). But the only error or abuse of discretion that we have determined might have occurred based on his appellate issues is the one or two jurors' seeing him in handcuffs. Otherwise, we have not overruled any other issue by a harm analysis, holding instead that none of Ford's other issues present any error or abuse of discretion or are reviewable, as the case may be. Thus, because the handcuffs exposure did not merit a mistrial, we overrule Ford's ninth issue. *See id.* ("[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error.").

26

**CONCLUSION**

We affirm the trial court's judgment. We deny all pending motions as moot.[3]

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Baker and Kelly

Affirmed

Filed: August 4, 2021

Do Not Publish

---

[3] Ford has also filed several letters in this Court, which we construe as attempted supplemental appellate briefing. Because Ford is represented by appellate counsel, who filed an appellant's brief and a reply brief on Ford's behalf, we do not consider any of the briefing in Ford's several letters because he is not entitled to hybrid representation, or to represent himself, on appeal. *See Marshall v. State*, 210 S.W.3d 618, 620 n.1 (Tex. Crim. App. 2006); *Scheanette v. State*, 144 S.W.3d 503, 505 n.2 (Tex. Crim. App. 2004).